UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
| VS. : | NO. 3:02CR341 (EBB) |
| DAVID BROWN : | NOVEMBER 1, 2005 |

**DEFENDANT DAVID BROWN'S MEMORANDUM IN SUPPORT OF
MOTION FOR JUDGMENT OF ACQUITTAL AND FOR A NEW TRIAL**

On September 7, 2005, a jury sitting in and for the District of Connecticut at New Haven returned guilty verdicts against David Brown on Count One (Conspiracy to Commit Mail Fraud and Wire Fraud), Count Three (Wire Fraud, Wesley Witcher/Shirley Witcher deal), Count Four (Wire Fraud, Willard Hyman/Andrea Williams deal), Count Five (Wire Fraud, Andrea Williams deal), Count Ten (Wire Fraud, Glen Morgan deal), Count Fifteen (Wire Fraud, Pamela Bozzuto deal), and Count Twenty-One (Wire Fraud, Paul DiMauro deal).  David Brown is seeking dismissal of all counts by Motion for Judgment of Acquittal pursuant to Rule 29 of the Fed. R. Cr. P.  Mr. Brown attacks all the above counts based on the failure by the Government to adduce proof that he, David Brown, committed the crimes alleged in those counts of the Fourth Superseding Indictment.  For the reasons set forth below, the Court should enter a judgment of acquittal for David Brown on the above counts. In addition and in the alternative, Mr. Brown seeks a new trial on all counts of the

1

indictment pursuant to Rule 33 of the Fed. R. Cr. P.

I. **ARGUMENT RULE 29**

Federal Rule of Criminal Procedure 29(a) provides, in relevant part:

"The court on motion of a defendant or of its own motion shall order the entry of judgment or acquittal of one or more offenses charged in the indictment or information after the evidence on either side is closed if the evidence is insufficient to sustain a conviction of such offense or offenses."

When a defendant moves for a judgment of acquittal, the Court

"must determine whether upon the evidence, giving full play to the right of the jury to determine credibility, weigh the evidence, and drew justifiable inferences of fact, a reasonable mind might fairly conclude guilt beyond a reasonable doubt. If [it] concludes that upon the evidence there must be such a doubt in a reasonable mind, [it] must grant the motion; or, to state it another way, if there is no evidence upon which a reasonable mind might fairly conclude guilt beyond a reasonable doubt, the motion must be granted. If [it] concluded htat either of the two results, a reasonable doubt or no reasonable doubt, is fairly possible, [it] must let the jury decide the matter."

United States v. Mariani, 725 F2d 862, 865 (2d Cir. 1984)(quoting United States v. Taylor, 464 F2d 240, 243 (2d Cir. 1972)). Accord United States v. Lieberman, 637 F2d 95, 104-105 (2d Cir. 1980). See also Jackson v. Virginia, 443 U.S. 307, 318-19 n. 11 (1979). But if the evidence viewed in a light most favorable to the Government gives "equal or nearly equal circumstantial support to a theory of guilt or a theory of innocence, then a reasonable jury must necessarily entertain a reasonable doubt" and this court should enter an acquittal. United States v. Glenn and Thompson, 312 F2d

58, 70 (2d Cir. 2002).

A district court can enter a judgment of acquittal on the grounds of insufficient evidence only if, after reviewing the evidence, both direct and circumstantial, in the light most favorable to the prosecution and drawing all reasonable inferences in the government's favor, it concludes no rational trier of fact could have found the defendant guilty beyond a reasonable doubt.  See Jackson v. Virginia, 443, U.S. at 318-19; United States v. Reyes, 302 F3d 48, 52-53 (2002); *See also* United States v. Walker, 191 F3d 326, 333 (2d Cir. 1999); United States v. James, 239 F3d 120, 123-124 (2d Cir. 2000).  Furthermore, this court can grant a Rule 29 motion on its own for reasons not even raised by a defendant.  United States v. Calderone, 917 F2d 717 (2d Cir. 1990); United States v. Baxley, 983 F2d 1265 (9th Cir. 1992).

In making a motion for judgment of acquittal, David Brown understands that "a defendant who challenges the sufficiency of the evidence supporting his conviction 'bears a heavy burden.' United States v. Finley, 245 F3d 199, 202 (2d Cir. 2001); *see also* United States v. Walsh, 194 F3d 37, 51 (2d Cir. 1999)." United States v. Velasquez, 271 F3d 364, 370 (2001).  Beside the Court viewing the evidence in a light most favorable to the government, the Court must recognize it is the jury's domain to determine the weight of the evidence and the credibility of the witnesses and it is the jury's choice as to competing inferences that can be drawn from the

evidence.  United States v. Guadagna, 183 F3d 122 (2d Cir. 1999); United States v. Morrison, 153 F3d 34, 49 (2d Cir. 1998).  As a result, in order to succeed, a defendant seeking a judgment of acquittal must demonstrate that "no rational trier of fact could [find] the essential elements of the crime charged beyond a reasonsble doubt." United States v. McDermott, 245 F3d 133, 137 (2d Cir. 2001)(internal quotation marks omitted); *see also* United States v. Bryce, 298 F3d 346, 352 (2d Cir. 1999).

Notwithstanding the above analysis, "it would not satisfy [the Constitution] to have the jury determine that the defendant is *probably* guilty..."  United States v. Glenn, 312 F3d 58, 64 (2d Cir. 2002)(*quoting* Sullivan v. Louisiana, 508 U.S. 275, 278 (1993))(*emphasis in original*).  *See also* Jon O. Newman, Beyond "Reasonable Doubt" 68 N.Y.U.L. Rev. 979, 989-90 (1993).

In making the instant motion, defendant contends that the evidence proffered by the government, even considered in a light most favorable to it and with all reasonable inferences drawn in its favor, was not sufficient as a matter of law and that no rational trier of fact could find the elements of the charged offenses proven beyond a reasonable doubt.  As a result, defendant's motion for judgment of acquittal must be granted.

**A.**     **Count Three (Witcher)**

The Wesley Witcher/Shirley Witcher deal essentially involved an allegation that Shirley Witcher's income was grossly inflated and that she did not work at Pratt & Whitney at the time that she and her son applied for financing with Mitsubishi Credit Corporation. Some of the Witchers' testimony was patently incredible and no reasonable jury could have believed it. For example, Wesley's testimony that after David Brown told him he needed a co-signer, he still didn't realize that the credit application would be sent to a finance company to approve the financing. *Tr. 8/10/05 at 216.* There was no MSRP sticker on the car, yet Mr. Witcher could not even identify David Brown in court. *Id.* He claims he picked up his mother to co-sign on the loan, and he remembers that she had her foster child with her, but his mother adamantly denies that the child was with her during the trip from New Haven to Branford. *Id at 273.* More importantly, for the purposes of this motion, Mr. Witcher could not testify who filled out the credit application containing the false information, *Tr. at 249,* but did tell the jury that all this information was filled out in the finance office, presumably by Bruce Vetre. *Id at 243-244.*

Additionally, Shirley Witcher's credibility is almost non-existent. The FBI testified that a few months before the trial, Mrs. Witcher said that David Brown was with her son when they went to pick her up in New Haven to co-sign. At trial, she denies ever saying that and claims that David Brown was not in the car when they

5

went to pick her up. Id at 252, 271.

Thus, there is insufficient evidence on this count to convict the defendant. Simply finding that the purchaser or the co-signer told Mr. Brown of the correct information concerning income and other aspects of the Witcher's financial situation cannot allow a jury to infer that it was David Brown who either faxed or Daybreaked incorrect and misleading information to the finance company. There is not even any inference that should be drawn that he was aware that false information was imparted to the finance company in California. As a Government key witness, Steven Van Overen, testified, that a password is needed to Daybreak consumer information to Mitsubishi Finance, and the information is typically sent not by the salesperson but by the finance or managing people at a car dealership. *Tr. 8/11/05 at 162-163.* Additionally, although the Government makes great mention of the fact that Mrs. Witcher did not even work at Pratt & Whitney, Mr. Van Overen conceded "that the system doesn't look at the name of the employer". Id at 179. Mr. Van Overen conceded that the computer initially makes a determination whether credit will be extended to a potential car purchaser but neither he nor the dealer knew which criteria the computer would use to determine if somebody was credit worthy. Id at 150.

**B.    Counts Four and Five (Andrea Williams and Willard Hyman)**

Count Four involves the purchase of a vehicle by Willard Hyman which was co-

6

signed for by his girlfriend, Andrea Williams. Count Five involves a purchase about two weeks later by Andrea Williams herself. The essence of the Government's claim of fraud in the Andrea Williams purchase were the phony money orders used to convince Mitsubishi Finance that the lien on Andrea Williams' used Maxima had been paid off. Andrea Williams testified that she knew nothing about these money orders. Or that the lien on her Maxima had not been paid off. She continued to make the payments long after she purchased a new vehicle from Shoreline Mitsubishi. *Tr. 8/15/05 at 150.* But Ms. Williams was adamant that she never had any discussion with David Brown concerning the payments or payoff on her Maxima. Id. In fact, she never even told him about her $256 monthly payments on the Maxima. Id at 152. She further asserted on cross examination that she had no reason to believe whatsoever that David Brown was in any way involved with the phony money orders concocted by Angel Hernandez. Id at 155.

    In order to taint Mr. Brown with this aspect of the fraud, the Government relied upon the testimony of Bruce Vetre, the General Manager, who later became Finance Manager. *Tr. 8/12/05 at 45, et seq.* There is no allegation whatsoever in Vetre's testimony that David Brown was involved in this aspect of the fraud. The best that could be said for the Government's case is Vetre's conclusory statement that David "knew" of the plan to use phony money orders. Id at 46. There is no explanation by

7

Vetre or anyone else how Brown knew, when he knew, or the basis of his knowledge. Furthermore, there is no explanation of how Vetre himself knew of David's knowledge, because there is no allegation even from Vetre that either he or Angel Hernandez discussed this ploy with David Brown. Even if one's credibility is to be strained, and a fact finder could assume that David "knew" of the phony money orders, this is nothing more than a situation of mere presence coupled with knowledge and not participation in this aspect of the scheme.

Admittedly, David Brown was the salesperson for the vehicles referred to in Counts Four and Five of the indictment. *Tr. 8/15/05 at 95.* Once again, the Andrea Williams credit application presumably submitted to Mitsubishi Finance contained false information about her income. She was not making $39,000 a year at the time. Id at 99. Yet, even Ms. Williams, the Government witness, admits that it was Bruce Vetre who had her fill out this false information and not David Brown. Id at 100-101. While she does allege that she told David Brown exactly how much she was making, and it was not $39,000, there is no claim, direct or indirect, that it was Brown who either put down the false information or conspired with anyone else to Daybreak false information to Mitsubishi Finance. She doesn't, in her testimony, connect David Brown in any way to the false information Daybreaked to the finance company. Id at 101-102. Similarly, the document both for her deal and that of her boyfriend, Hyman,

8

for whom she co-signed, were all signed and completed in Bruce Vetre's office. Id at 108. And it was he, Vetre, who went over the paperwork and failed to explain the balloon payments to her and Willard. Id at 110-111, 117. The documents were all signed in Vetre's office, and there wasn't a scintilla of suggestion that David Brown was aware of what was going on in that office. Id at 134-135, 139, 146.

To some extent, the Government had struggled to connect Mr. Brown with the frauds of Counts Four and Five through the testimony of Vetre. Even Vetre concedes that the phony money orders were all the idea of Angel Hernandez and himself. *Tr. 8/12/05 at 45-46.*

Further, on the Williams' deal, Vetre asserted that the credit application was blank as to Williams' income. This is the situation where a jury would have to speculate that Brown knew that false information was going to be input into the Daybreak system by virtue of inadvertently leaving a blank space on a credit application. Id at 56. Furthermore, if the application submitted by Brown to Vetre for Williams did not contain false information, why did Angel Hernandez destroy that document? Id at 58.

Just as in the previous count, there is simply insufficient evidence for the jury to have concluded that David Brown was aware that false information would be disseminated to the finance company as to Counts Four and Five.

9

### C.   Count Twenty One (Paul and Genevieve DiMauro)

As in the other counts, there is a total lack of any evidence, direct or indirect, that David Brown was responsible for false information contained in the credit application. Mrs. DiMauro testified that the information as to her income and mortgage or rent was inaccurate. *Tr. 8/19/05 at 22-23.* But unlike some of the other counts, both DiMauros conceded that the car was being purchased for their grandson and that he had met and possibly given inaccurate or false information to whoever filled out the credit application. In the scheme of things, this could have been done well before the DiMauros arrived since the grandson was unemployed and had a strong desire to own a vehicle. Id. *Tr. at 33.* Furthermore, Mrs. DiMauro clearly stated that David Brown was not the one who presented her with the credit application containing false information but that it was someone in the finance office. Id at 37. She also clearly stated that she had no idea at the time she testified if David Brown had anything to do with the false information on the credit application.

Furthermore, Paul DiMauro who referred to Mr. Brown as "Mr. Green" never even saw or talked to David Brown at the time he signed the application. *Tr. 8/18/05 at 268, 272.* He concurred with his wife that he only dealt with the person in the finance department who presented him with the application with the false information. He also told the jury that even if he knew the information contained was false, he

10

might have signed it anyway. Id at 279. He further testified that nobody tricked or deceived him in any way and he purposely and deliberately didn't sign anything that was placed in front of him. He had no idea who drew up the documents. Id at 287, 289, 294.

**D.    Count Ten (Gwendolyn Morgan and Lisa Brody)**

Lisa Brody co-signed for her friend, Gwendolyn Morgan, for the purchase of a vehicle from Shoreline Mitsubishi. *Tr. 8/124/04 at 5.* Gwen Morgan had first gone down to the dealership and then Ms. Brody spoke to David Brown over the phone. Id at 8-9. She told the jury that the information on the credit application which was Daybreaked to the finance company was inaccurate as to her rent and her income. Brody testified that she had no idea how the false information including erroneous income was placed in the customer application which she signed and which was Daybreaked to Mitsubishi Finance. Id at 10. But she did describe totally chaotic conditions at the dealership on the day she went there which could explain an erroneous as opposed to a deliberate effort to distort. Id at 10-12. At the time she had gone into the finance office which went over the final paperwork, the information was correct. Id at 12. More significantly, David Brown was not the man who was the finance person and did not go over the paperwork, Daybreak it, or type it up. Id at 25-26. She also had no idea if David Brown ever even spoke to the white finance person

11

who typed up the erroneous information on the credit application. Id at 26-28. She is certain that David Brown wasn't even in the finance office when all this was being done. Id at 30. She could offer no idea why the changed numbers were different than what she thinks she had told David Brown over the phone earlier that day. Id at 33.

Thus, once again, there is insufficient evidence to link David Brown to the fraudulent wire fraud in this count.

E.   **Count Fifteen (Pamela and Marie Bozzuto)**

Pamela Bozzuto purchased a vehicle from Shoreline and had her sister, Marie Bozzuto, who was unemployed at the time as a co-signer. The actual paperwork was done later in the evening on the day in which both women came to Shoreline. Shortly after the women arrived and before the paperwork was even prepared, David Brown was involved in a physical altercation with another employee and was fired. *Tr. 8/25/05 at 119-120.* Despite having told David Brown that her sister, Marie, was unemployed, the credit application Daybreaked to the finance company stated that she worked at VRC, a company owned by the finance manager, Bruce Vetre. It was Bruce who prepared the paperwork. It was Bruce who got the information needed for the paperwork, and it was Bruce Vetre who Daybreaked all this information to Mitsubishi Finance in California. Id at 130. Although, as conceded, the information on the credit application differed from what Pamela and Marie had told David Brown

12

concerning Marie's lack of employment, the witness could not even testify that there was any conversation between David Brown and Bruce Vetre. Id at 130-131. Furthermore, Marie Bozzuto conceded that she had never even met David Brown in her life. Id at 157. Thus, the evidence on the Bozzuto count does not establish the necessary link between correct information allegedly passed by the consumer to David Brown and false information disseminated to the finance company to induce it to extend credit to the Bozzutos. The Government tries to breach this gap in its effort to present sufficient evidence to convey to the jury, through the Vetre testimony concerning the Bozzuto deal. *Tr. 8/12/05 at 65.* Mr. Brown allegedly said to Vetre that Angel Hernandez wanted Vetre to put his company, VRC, as the employer for Marie Bozzuto. Vetre concedes it was Angel Hernandez's idea, *Tr. at 65-66*, and not that of David Brown's. The best that could be said for the Government's case is Brown was doing no more than relating a message from Angel Hernandez, his superior. There was nothing to suggest that Brown was advocating that Vetre submit a false application or that he was condoning the activities of Angel Hernandez and Vetre.

More significantly, the testimony of Vetre should be totally discredited because of the inconsistency with that of Pamela Bozzuto. Pamela Bozzuto testified that she had no idea that the false information containing her sister's income and employment

13

was being utilized in the finance application and that she never asked Vetre if she would "get in trouble for this". *Tr. 8/25/05 at 133.* Vetre who provides the key evidence for Government on this count, testified as a defense witness for Mr. Brown that at the time of the closing in his office, Pamela Bozzuto had, in fact, asked him if she would get in trouble for this occurrence. Because testimony of a key Government witness, Pamela Bozzuto totally discredits that of Bruce Vetre, Bruce Vetre's testimony should be totally disregarded by this court in determining the sufficiency of the evidence as to this count.

F.   **Conspiracy**

The conspiracy count fails for the same reasons that the substantive counts fail. The Government tries to link up David Brown to the actions of the sales managers and finance people who are actually disseminating Daybreak information containing false credit applications. As previously stated, for example, Vetre claims that David Brown was present at a Saturday morning meeting when Angel Hernandez stated that the finance people will boost incomes in order to make uncredit worthy customers eligible for financing from Mitsubishi credit. Since he could not remember who else was at this meeting or anyone who was at any other meeting, his credibility is highly suspect. The cooperating witness, Jose Espinosa, conceded it was the sales people who rewrote credit applications. *Tr. Vol. 5 at 220.* He worked regularly with

David Brown but never saw David Brown rewrite a credit application or change the income or expenses as told to him by the purchaser. *Id at 221.* He did testify that he saw David Brown utilize phony pay stubs on one occasion but this effort was unsuccessful in inducing Mitsubishi Finance to extend credit. *Id at 230.*

Contrary to what Vetre said, Espinosa testified that on two occasion and not one, Angel Hernandez at Saturday meetings discussed the inflating incomes by finance people. *Tr. 8/17/04 at 29.* He was unable to testify whether David Brown was at either of these meetings. He reiterated time and again that it was the sales managers who increased the income and put in false rental or mortgage information. *Tr. at 50.* He explained to the jury that the salesman's job after showing the vehicle to the purchaser was to get the license plate and deliver a sealed envelope to the customer with the necessary documents in it. *Id at 51.* The salesman's job was "to show them the car". *Tr. at 51*.

He did testify that he on <u>one</u> occasion saw David Brown Daybreak a deal, but there was no indication that this was one of the fraudulent deals referred to in the indictment and that, in any event, the finance person carefully goes over all the numbers and the papers with the customers. *Id at 131.*

III.     <u>Rule 33 Motion for a New Trial</u>

Unlike a motion for a judgment of acquittal, a motion for a new trial should be

granted if it is "in the interest of justice". Rule 33. A court has broad discretion to set aside a jury verdict and order a new trial to avert a perceived miscarriage of justice. United States v. Sanchez, 969 F2d 1409, 1413 (2d Cir. 1992). The motion can be used for a claim that the jury verdict was against the weight of the evidence. United States v. Landau, 155 F3d 93, 104 (2d Cir 1998) (A new trial is proper where the court "is convinced that the jury has reached a seriously erroneous result"). Unlike a Rule 29 motion, a motion under Rule 33 allows the court to evaluate the weight of the evidence and the credibility of witnesses. United States v. Sanchez, supra at 413. This rule gives the District Court "broad discretion...to set aside a jury verdict and order a new trial to avert a perceived miscarriage of justice". United States v. Ferguson, 246 F3d 129, 133 (2d Cir. 2001). So that even if the court finds that there was sufficient legal evidence to convict, it can grant a new trial under Rule 33 where "the credibility of the principal witness was weak and the soundness of the verdict is highly doubtful". United States v. Autori, 212 F3d 105, 121 (2d Cir. 2000). See also, United States v. Ferguson, supra at 134-137.

     For all of the reasons set forth in the motion for a judgment of acquittal, the court should conclude that the evidence against Mr. Brown was weak, and it would be an injustice to convict him on such flimsy testimony. The Government buttressed its case against Mr. Brown by the testimony of cooperating witnesses such as Pierro,

16

Concepcion, Espinosa, and Clanton. These witnesses were caught in an array of inconsistencies and their credibility was highly suspect because of the extremely favorable plea agreements they had entered into and their expectations of 5K1 motions which would greatly reduce their exposure. Some like Clanton and Pierro consistently lied at the trial about what they had told the Government or about their criminal records. It is this very type of testimony to which Rule 33 is directed and which the court should carefully scrutinize before giving its imprimatur of approval to the jury's guilty verdict.

Finally, the Government's case would appear to primarily revolve around the credibility of Bruce Vetre. Vetre, a sales manager for Shoreline Mitsubishi, had no criminal record and was impeached, among other ways, for a false credit application that he himself submitted for a Lexus which he purchased while he was unemployed and between his two job stints at Shoreline Mitsubishi. This testimony, of course, was minimized by the Government and probably had little impact on the minds of the jury as to his credibility. Defendant, David Brown, proposed to call a witness who was also a salesperson at Shoreline Mitsubishi and would have testified that while Vetre worked there, he asked various people if they knew anyone who could steal the Lexus and bring it to a chop shop so he could collect insurance and avoid the monthly payments. The court, on a motion in limine by the Government, precluded the

17

defendant from offering such testimony. The court should grant a new trial any time exculpatory evidence is excluded at trial. United States v. Lis, 120 F3d 28, 29 (4th Cir. 1997). When excluded evidence would weight heavily on the credibility of witnesses, the courts have held it is in the "interest of justice" to grant a new trial. United States v. Kellington, 217 F3d 1089, 1097 (9th Cir. 2000) See also, United States v. Ferguson, 246 F3d 129 (2d Cir. 2001).

## IV. Conclusion

For all of the above reasons, this court should either grant the Rule 29 motion for a judgment of acquittal or, alternatively, grant a Rule 33 motion for a new trial.

Respectfully submitted,

DEFENDANT, DAVID BROWN

By:_____
Richard S. Cramer
449 Silas Deane Highway
Wethersfield, CT 06109
Tel. (860) 257-3500
Federal Bar No. ct00016
Email: cramer@snet.net