# UNITED STATES DISTRICT COURT

# DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | **:** | **No. 3:02 cr 341 (EBB)** |
| **vs.** | **:** | |
| **SHORELINE MOTORS, ET AL** | **:** | **February 2, 2002** |

## ANGEL HERNANDEZ'S AND DAVID BROWN'S JOINT MEMORANDUM IN AID OF SENTENCING: "LOSS" AND RESTITUTION

The following discussion of points and authorities is respectfully submitted on behalf of Angel Hernandez and David Brown, defendants, to assist the Court in its determination of: (1) the victims' "loss" for purposes of the offense level under Section 2B1.1 of the sentencing guidelines; and, (2) the determination of the amount of restitution which should be ordered in the judgment under 18 U.S.C. §3663A. It is the defendants' position that the record fails to provide the Court with sufficient evidence upon which to base a finding for either of these purposes and that the Court should therefore employ an alternative method to set the offense level, and, with respect to restitution, simply decline to enter any order because, if there ever was a case for which the Section 3663A exception for complexity was appropriate, the instant case is it. Because the issues presented are common in all respects to the sentencing of both Angel Hernandez and David Brown, leave is requested to file this memorandum on behalf of both of these defendants, i.e. a joint submission.

–1–

**Background**

Angel Hernandez and David Brown were convicted after a jury trial of conspiracy to commit, and substantive violations of the mail and wire fraud statutes, 18 U.S.C. §371, §1343, et seq. The charges arose from the defendants' employment (as manager, Angel Hernandez, and as a sales-person, David Brown) at a local new car dealership, Shoreline Mitsubishi ["Shoreline"]. The Court, in its rulings on the defendants post-trial motions, noted that the jury had to have found that the defendants engaged in a scheme to defraud both the entity which provided purchase-money financing to Shoreline's customers, and committed various other frauds upon the customers themselves. The evidence disclosed that the  defendants caused customer  loan applications to be transmitted to the finance company, Mitsubishi Motors Credit of America ["MMCA"] which included falsified, or in some cases fictitious, information on them, which representatives of MMCA testified were material to MMCA's decisions to lend the purchase-monies to the customers, and on what terms. The loan portfolio created at MMCA for Shoreline during the period of the conspiracy totaled over $50 million. According to the MMCA witnesses, the performance of these loans to Shoreline customers was substandard.

In the first disclosure of the pre-sentence report [PSR] the loss-figure to MMCA for purposes of the guidelines offense level computation was found to be $6.4 million. This was the same figure proposed by the government in its submission to the probation department during the pre-sentence investigation. The $6.4 million was the loss ostensibly suffered by MMCA as a result of the false loan-application scheme. The only specific basis for the figure was a letter from counsel for MMCA in Connecticut which informed that persons at MMCA had analyzed the MMCA loan portfolio from Shoreline and determined

that it realized $6 million more in losses when compared to other MMCA loan portfolios. The use of a loss figure of $6 million triggered an 18-level enhancement in the offense level for defendants Angel Hernandez and David Brown. This, in practical terms, is something like a 10-year increase in the guideline range for prison for these defendants. Defendant Angel Hernandez submitted a written objection to the proposed loss figure in the first disclosure and ultimately a preliminary sentencing hearing was held on the loss and restitution issues on September 19, 2006. The second disclosure of the PSR, and the sentencing hearings of all of the defendants have been held up awaiting resolution of these issues.

## Burden and Standard of Proof for "Loss" under Section 2B1.1 of the Guidelines

The government bears the burden of proof for purposes of establishing the loss figure under the guidelines. The traditional *standard* of proof for sentencing fact-issues is the "*preponderance of evidence*" standard. Guidelines Section 6A1.3(a) (Policy Statement) [Note all references to guidelines in this memo are to the *November 1, 2001*, guidelines manual , *see*: Section 1B1.11]. Moreover, the Sentencing Commission has advised that the Court need only make a "*reasonable estimate*" of the loss to the victim caused by the fraud. Guideline section 2B1.1, Application Note 2(c). However, as a preliminary issue, the defendants respectfully submit that in order to comply with notions of "due process" and fundamental fairness required by the United States Constitution's Fifth Amendment,  the Court is required to employ a heightened standard of proof where the factual finding at

issue so dominates the guideline prison-range calculation. In its seminal *Booker-Fanfan*[1]

decisions, the Supreme Court held that any factual issue which could have the effect of

increasing a defendant's term of incarceration beyond the maximum prescribed in the

statute for the offense charged (except the fact of a defendant's prior convictions) had to

be resolved by the jury, and proven beyond a reasonable doubt. The sentencing

guideline's scheme of fact-finding by the Court and its prescription of the preponderance

standard was held to violate the Sixth Amendment's guarantees. Thus, the guidelines are

now "advisory". However, their significance to sentencing has not evaporated, post-*Booker*.

Thus, the Second Circuit in *Crosby*[2] and its progeny, has instructed that the Court must still

perform a guideline computation, and that the results must be considered, on an equal

footing, with the other statutory factors in arriving at a sentence which is "sufficient but not

greater than necessary" under 18 U.S.C. §3553(a). The Second Circuit has further

indicated the continuing importance of the guideline calculation in post-*Booker* cases when

it established the rule  that an erroneous guideline computation which is carried into the

Court's analysis under the statutory requirements and purposes constitutes an error which

requires remand.   *United States v. Fagans*, 406 F.3d 138 (2d Cir. 2005).

Indeed, in his dissent in *Booker*, Justice Thomas, referring to the preponderance

standard in guideline Section 6A1.3, pointed out that "the Court's holding today corrects

this mistaken belief. The Fifth Amendment requires proof beyond a reasonable doubt, not

by a preponderance of the evidence of any fact that increases the sentence beyond what

---

[1]    *United States v. Booker*, 543 U.S. 220 (2005); *United States v. Fanfan*, 542 U.S. 963 (2004).

[2]    *United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005).

could have been lawfully imposed on the basis of facts found by the jury or admitted by the defendant." *United States v. Booker,* 543 U.S. at 319 n.6 (Thomas, J., dissenting).

There is ample precedent for employing a heightened standard of proof even before *Booker.* Thus, the Circuit Court of Appeals has held that a sentencing factor which increased the prison sentence from 30 months to 30 years must be proven by *clear and convincing evidence*. *United States v. Kikumura*, 918 F.2d 1084, 1102 (3d Cir. 1992). The Eighth Circuit has also suggested that a sentencing factor producing an 18-level increase in a base offense level and a 7-fold increase in the permissible sentencing range might require findings to be made pursuant to the clear and convincing standard. The Eighth Circuit noted that:

> *. . . the preponderance standard the Court approved for garden variety sentencing determinations may fail to comport with due process where, as here, a sentence enhancement factor becomes 'a tail that wags the dog' of the sentencing offense.*

*United States v. Townley*, 929 F.2d 365, 370 (8th Cir. 1991). Other decisions which have addressed this issue include, *United States v. Trujillo*, 959 F. 2d 1377, 1382 (7th Cir. 1992) (suggesting that clear and convincing evidence might be required for extraordinary upward adjustments or departures), *cert. denied*, 506 U.S. 897 (1992); *United States v. Lam Kwong-Wah*, 966 F. 2d 682, 688 (D.C. Cir. 1992 ) (suggesting that clear and convincing evidence might be required for extraordinary upward adjustments or departures), *cert. denied*, 506 U.S. 901 (1992).

The Second Circuit has expounded on this issue in *United States v. Concepcion*, 983 F.2d 369, 394 (2d Cir. 1992) (Newman, J., concurring), *cert. denied*, 510 U.S. 856

(1993); (". . . a strong argument can be made that a clear and convincing standard should be used for substantial enhancements [under The Guidelines]"); *United States v. Shonubi*, 103 F.3d 1085, 1085-87, 1089 (2d Cir. 1997) ("Though the Sentencing Commission has favored the preponderance-of-the-evidence standard for resolving all disputed facts at sentencing . . . we have ruled that a more rigorous standard should be used in determining disputed aspects of relevant conduct where such conduct, if proven, will significantly enhance a sentence."); *United States v. Gigante,* 94 F.3d 53, 56 (2d Cir. 1996), *cert. denied*, 522 U.S. 868 (1997) ("Where a higher standard, appropriate to a substantially enhanced sentence range is not met, the court should depart downwardly.")

It is also significant that the Second Circuit, in order to provide a measure of fairness when confronted with this issue, fashioned a remedy through the use of the court's power to depart in a situation involving:

> *. . . an enormous upward adjustment . . . not proved at trial . . . and found by only a preponderance of the evidence . . . , where the court has substantial doubts as to the accuracy of the finding, the Court would be authorized to depart downward from the scheduled adjustment by reason of this extraordinary combination of circumstances.*

*United States v. Cordoba-Murgas,* 233 F.3d 704, 709 (2d Cir. 2000). With respect to relevant conduct, when it is a basis for an upward adjustment in the range, the Court stated that any doubts the sentencing court had about the strength of the evidence could properly be accounted-for by use of its discretion to depart. *Id.* at 708-710. In *A Trial Judge's Second Impression of the Federal Sentencing Guidelines,* Judge Weinstein describes the results of a survey of judges regarding their burden of proof practices in sentencing determinations. 66 S. Cal. L. Rev. 357 (1992). Of the 57 judges in the Eastern and

Southern Districts of New York, twenty judges responded. Of the twenty, five reported that they use a preponderance standard, but four of those added qualifications. One utilized a "preponderance" standard which was a standard of proof of "two-thirds or higher"; another used a heightened certitude standard; another gave hearsay and other forms of inadmissible-at-trial evidence less weight; another applied common sense  erring , if at all, for the defendant.  Nine of the twenty judges used a heightened  burden commensurate with the enormity of the effect of their findings.  Of the remaining six judges, one used a clear and convincing standard on all issues; and one a 60% standard.

The Ninth Circuit , in *United States v. Restrepo*, held that "due process is generally satisfied when a district court uses the preponderance of the evidence standard in making findings in sentencing proceedings." *United States v. Restrepo*, 946 F.2d 654, 661 (9th Cir. 1991) (en banc).  The Court noted, however, that "there may be an exception to [this] general rule . . . , when a sentencing factor has an extremely disproportionate effect on the sentence relative to the offense of conviction." *Id.* at 659.  In such instances, the Court suggested that clear and convincing evidence might be required. The Ninth Circuit first overturned a district court's sentencing determination for failure to use an enhanced standard in *United States v. Hopper. United States v. Hopper*, 177 F.3d 824, 833 (9th Cir. 1999), *cert. denied*, *United States v. Reed,*  529  U.S. 1063 (2000).  The *Hopper* court ruled that a 7-level increase in the defendant's  offense level (which increased the sentencing range by 4 years) based on victim and violent conduct enhancements, triggered the requirement of a heightened standard under the *Restrepo* "extremely disproportionate" test. Finally, in *United States v. Valensia*, the Ninth Circuit identified a set of specific factors

for courts to consider in determining whether a heightened standard of proof was required as follows:

>    (1)    Does the enhancement fall within the maximum sentence for the crime alleged  in the indictment?
>
>    (2)    Does the enhanced sentence negate the presumption of innocence or the prosecution's burden of proof for the crime alleged in the indictment?
>
>    (3)    Do the facts offered in support of the enhancement create new offenses requiring separate punishment?
>
>    (4)    Is the increase in sentence based on the extent of a conspiracy?
>
>    (5)    Is the number of offense levels less than or equal to four?
>
>    (6)    Is the extent of the enhanced sentence more than double the length of the sentence authorized by the initial guideline range in a case where the defendant would otherwise have received a relatively short sentence?

*United States v. Valensia*, 222 F. 3d 1173 (9th Cir. 2000).  The Court cautioned that it was not attempting to fashion a bright-line rule.  Rather, the analysis was to be made on a case by case basis without relying on any single factor as controlling.   This totality of the circumstances test is consistent with the Supreme Court's instruction that "[d]ue process is flexible and calls for such procedural protections as the particular situation demands."  *Id.* at 1182 (quoting *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972)).

Several district courts have addressed the proposed heightened standard for sentencing factors. Thus, in *United States v. Gray,* the defendant argued that, in light of *Booker*, "*reasonable doubt is the correct burden of proof to apply to factual determinations at sentencing.*"  *United States v. Gray,* 362 F.Supp.2d 714, 719 (S.D. W. Va. 2005). The Court ultimately disagreed, but did state that:

>    *The reasonable-doubt standard does retain some*
>    *usefulness in the new advisory system ... Specifically,*

> *the reasonable-doubt standard offers a useful method*
> *for measuring the degree of certainty that I have in*
> *the factual determinations underpinning the advisory*
> *guideline range.*

*Id.* at 720.  The court in *Gray* used the reasonable doubt standard not as the sole standard

of proof at sentencing, but as one aspect of a multi-factored analysis designed to insure

that the sentence imposed rests on a firm factual basis.

This technique has been used by other courts, as well.  In *United States v. Leroy*,

Judge Adelman cites *Gray* and writes:

> *. . . in determining what weight to give the advisory*
> *guidelines, it may be helpful for the court to consider*
> *whether any guideline enhancements are supported*
> *by evidence beyond a reasonable doubt . . . . courts*
> *should not impose sentences based on the sort of flimsy*
> *evidence that often passed under the old regime.*

*United States v. Leroy*, 373 F.Supp.2d 887, 889 n.2 (E.D. Wis. 2005). So, too, Judge

Gertner cites *Gray* and notes:

> *If a substantial sentence hinges on a finding of a*
> *specific quantity, then . . . I (and the public) should have*
> *a high degree of confidence in this finding.*

*United States v. Malouf*, 377 F.Supp.2d 315, 329 (D. Mass. 2005); *see also United States*

*v. Coleman,* 370 F. Supp.2d 661 (S.D. Ohio 2005).

Some courts  directly require proof beyond a reasonable doubt in all sentencing

enhancements.   In *United States v. Huerta-Rodriguez*, Judge Bataillon noted: "[t]his

approach may not be mandated by *Booker*, but it is not inconsistent with, or prohibited by

*Booker"*.  *United States v. Huerta-Rodriguez*, 355 F.Supp.2d 1019, 1027 (D. Neb. 2005).

Judge Bataillon went further in *United States v. Okai* to hold that the due process clause

of the Fifth Amendment *required* proof beyond a reasonable doubt because *Booker*

addressed only the issue as a matter of the Sixth Amendment issue not under the Fifth

Amendment. *United States v. Okai*, 2005 WL 2042301 (D. Neb. Aug. 22, 2005). Judge

Gertner notes in *United States v. Pimental*, that:

> [E]ven if the Sixth Amendment's jury trial guarantee is
> not directly implicated because the regime is no longer a
> mandatory one, the Fifth Amendment's due process
> requirement is . . . . We cannot have it both ways. We
> cannot say that facts found by the Judge are only advisory,
> that as a result, few procedural protections are necessary
> and also say the Guidelines are critically important.  If the
> Guidelines continue to be important, if facts the Guidelines
> make significant continue to be extremely relevant, then
> Due Process requires procedure safeguards and a heightened
> standard of proof, namely, proof beyond a reasonable doubt.

*United States v. Pimental*, 367 F. Supp. 2d 143, 154 (D. Mass. 2005)*.*

It is respectfully submitted that a factual finding of such paramount significance to

liberty-interests of the defendants (the "loss" figure) be required to be proven by the

government pursuant to a heightened standard, one which is commensurate with the

factor's  impact upon the guideline range.


**The Record-evidence is Insufficient for the Court to Make a Reasonable Estimate of
Loss, Under any Standard of Proof**.

At the time that the PSR was written, the probation officer did not have the benefit

of the transcript of the preliminary sentencing hearing on the issue of loss. Rather, the

figure for loss in the initial disclosure is simply adopted from the government's submission,

principally the letter from counsel for MMCA, discussed earlier.

The preliminary sentencing hearing took place on September 19, 2006. The purpose of that proceeding was to afford the government the opportunity to present something probative to the Court to support the loss figure it had proposed to the probation department, and to which the defendants had made objection. However, instead of presenting the testimony, documents, and financial analyses to explain the $6.4 million figure, the government  argued that there were four different ways to arrive at the loss figure – actually, to arrive at four wildly disparate loss figures.

The government presented the testimony of a representative of MMCA, the credit arm of Mitsubishi Motors, Diane Cutillo, who attempted to explain in her testimony the "Shoreline Loss Comparison" as reflected on the chart, Government's Exhibit AB. The defendants had taken specific issue with the government's promoting the "loss comparison" referred to in the Wiggin and Dana letter primarily because it simply stated a conclusion. Thus working with simply that letter, neither the Court nor the defendants had any way to examine the methodology used, the analyses which had to be performed on the unspecified underlying data, the qualifications of the persons who made the computations and comparisons of the portfolios referred to in the letter, as well as whether or not the "loss" figure was an accounting entry for the books of MMCA, or was it a figure that reflected that economic results of the performance of the portfolio from the perspective of the parent company – the entity who manufactured and sold the new cars to Shoreline. About all that was learned from the witness, however, was that she had assembled a collection of computations made by members of the MMCA staff and transported them from California to Connecticut for the hearing. Ms. Cutillo was candid in her description of her knowledge concerning the underpinnings of the loss figures shown on the exhibits: she

-11-

really had no knowledge about them at all. Thus, Ms. Cutillo agreed that she could not tell the Court the premise or methodology upon which the Exhibit AB was computed. In fact, the witness admitted she personally has never computed a loss amount. (Tr. pp.120-121). The witness did confirm that the finance company, MMCA, was in fact a wholly owned subsidiary of Mitsubishi Motors North America [MMNA, together with MMCA, "Mitsubishi"](Tr. p. 89) and that the proffered loss computations did *not* account for any profit which Mitsubishi Motors realized from the sale of the newly manufactured cars to the Mitsubishi dealerships. (Tr. pp. 131-132). Government's Exhibit AB 's status as an enigma was not affected in any way by the testimony.

The second method promoted by the Government went even further in disregarding any fact-finding fairness or opportunity by the defendants to explore and test the foundation of its premise. Again, Ms. Cutillo served as a courier to deliver to the Court an exhibit she knew nothing about. Government's Exhibit AA purports to show the debt which Mitsubishi forgave in resolution of the civil actions brought by the customers of several dealerships, including Shoreline, against MMCA and MMNA. Copies of the superior court complaints disclosed allegations against Mitsubishi alleging wrongdoing by Mitsubishi, including CUTPA violations. Again, the Court and the defendants were offered a conclusion – that Mitsubishi had written off some $2.7 million in loan balances owed by, presumably, Shoreline customers who had purchased new cars during the conspiracy.

Any probative value which the testimony of the government witnesses at the hearing and the figures for loss which they attempted to proffer was lost when it became clear that: (1) the plaintiffs all utilized the exact-same affidavit-language to perfect their claims, each claiming that they had been inadequately advised by Mitsubishi or the salespersons of the

terms of the financing agreements. But, the testimony at trial was not so pat – several of the trial witnesses testified that their problem with the Shoreline sales methods did not involve a failure to explain the Diamond Advantage plan, but rather, they had been charged for accessories they never asked for, or never received them if they did request them, etc. The absolute solidarity of the affidavits is also rendered suspect by the government's own exhibit which catalogues the specific modes of fraud claimed by some 500 Shoreline customers, many of whom apparently did *not* claim to have been misled regarding the terms of their financing agreements; (2) The papers supplied by the government at the hearing which were offered to support the fact that the customer litigation resulted in the $2.7 write-off, did not include any indication of the reasons why Mitsubishi felt it was in its interests to fold its hand in this litigation. Any connection between this loss and the offense conduct had to be constructed with mere speculation. Moreover, when the parties, joined by the Court, requested access to the critical portions of the settlement documents, a Mitsubishi attorney refused to produce the papers (even with the promise of a protective order). The extraordinary grasp of the law of federal sentencing possessed by the Mitsubishi attorney was apparent from the reasons he gave for refusing the Court's request – the settlement papers were "not relevant" to the sentencing determination (he "ruled") because the defendants had been found guilty of fraud. It is submitted that the only reasonable inference which can be drawn from this remarkable response is that Mitsubishi was indeed responsible for the financing debacle because it was caused by its unprecedented "Diamond Option" and "Diamond Advantage" financing plans; (3) The testimony of the only other witness called by the government at the hearing was no more useful to the loss issue. A special agent of one of the agencies involved in the investigation

informed the Court that he was filling in for the case agent. He did not deny that he knew little or nothing about the documentary exhibits which the government placed in from of him. Apparently, as a means of showing the profit realized by the entity Shoreline during the pertinent period of time, the agent was asked to read into the record various figures from the financial statements of Shoreline which the government had obtained during the investigation. The agent was at a loss to offer any information regarding such critical issues as: what portion of the profit-figures shown on the financials was attributable to new car sales as opposed to the body shop, automobile service department, parts sales, used car sales, etc. (Tr. p. 190).   It is submitted that the gross figures proffered as "gain" for purposes of the alternative method for determining the offense level under section 2B1.1 are simply too vague to be the evidentiary foundation for a reasonable estimate  pursuant to any standard of proof; (4) The agent also read figures from a summary exhibit which listed the monetary compensation paid by the Shoreline entity to the defendants over the course of the conspiracy period. The problem with the proposed use of these figures for "gain" under the alternative offense level determination is that these figures do not differentiate at all between the compensation paid as a result of the offense conduct as opposed to the wages, commissions, etc. earned from the employees' legitimate work for the dealership. (Tr. p. 171).

The defendants offered the testimony of a car financing expert who explained just how radical – indeed doomed – the Mitsubishi car financing programs were. An excessive incidence of loan defaults were experienced across the country by Mitsubishi dealerships during the same period that Shoreline was promoting the financing plans. It was explained how the customer was "upside down" almost immediately after a purchase made with

balloon financing. The object of MMCA's system was to get the new cars off the books of its parent MMNA. MMNA realized a substantial profit from the sale of the newly manufactured car to the dealership and whatever MMCA collected, if anything, from the customer on the financing deal was additional profit. (Tr. p. 204). The expert also described how the MMCA loan application processing and approval system – the computerized Daybreak system – constituted an invitation to fraud and that MMCA's failure to undertake any verification of the financial information of the borrower – before or after the sale – was a substandard, negligent lending practice for which substantial responsibility for the default rate should be attributed. (Tr. pp. 232-233).

It is respectfully requested that, in view of the record, and because of the extremely important role that the factual determination at issue plays in the sentencing process, the Court find that the government has failed to satisfy its burden of proof — whether by a preponderance, or by clear and convincing evidence, or by proof beyond a reasonable doubt – and that it is not possible to make a *reasoned* finding of "loss" or, in the alternative, "gain", for purposes of the sentencing.

## A Figure for Restitution Cannot be Computed on the Current Record, Either.

Sections 3663 and 3663A give the district court authority to decline an order for restitution:

> *. . . if the court finds, from facts on the record, that . . .*
> *determining complex issues of fact related to the cause*
> *or amount of the victim's losses would complicate or prolong*
> *the sentencing process to a degree that the need to provide*
> *restitution to any victim is outweighed by the burden on the*
> *sentencing process.*

18 U.S.C. §3663A(c)(3)(B). These provisions:

> *call for a weighing of the burden of adjudicating the*
> *restitution issue against the desirability of <u>immediate</u> restitution -*
> *or otherwise stated, a weighing of the burden that would*
> *be imposed on the court by adjudicating restitution in the*
> *criminal case against the burden that would be imposed on*
> *the victim by leaving him or her to other available legal remedies.*

*United States v. Kones*, 77 F.3d 66, 69 (3d Cir. 1996).    One court has noted that:

"individual civil suits are a much more appropriate means of addressing restitution . . . ."

*United States v. C.R. Bard, Inc.*, 848 F.Supp. 287, 292-93 (D. Mass. 1994).

While not identical, the standards applicable the to burden and requisite quantum of credible proof necessary for the Court to arrive at a figure for restitution is similar to the forgoing analysis of the determination of the "loss" figure for the guideline's offense level. It is submitted that the infirmities which permeate the government's submission on loss, are applicable with equal effect to the restitution issue.

As previously stated, the government argued that there were four different ways to arrive at the loss figure.  These various "methods" are conclusory and unfounded.  In actuality, the government and MMCA proposed several figures that range over $10 million. From the record, it is submitted, the "reasonableness" figure for restitution is either $0, or unknowable.

## <u>Conclusion</u>

For all of the foregoing reasons, it is respectfully requested that the Court should employ an alternative method to set the offense level, and, with respect to restitution, decline to enter any order.

-16-

Respectfully submitted,
ANGEL HERNANDEZ, defendant

By: Kurt F. Zimmermann, his attorney
Fed. Bar No. ct00581
SILVERSTEIN & OSACH, P.C.
234 Church Street
New Haven, Connecticut 06510
(203) 865-0121, 865-0255 fax
Email: kzimmermann@so-law.com


Respectfully submitted,
DAVID BROWN, defendant

By: Robert C. Mirto, his attorney
Fed. Bar No. ct00188
MIRTO, KETAINECK, BARRETT & DiCROSTA
P.O. Box 428
West Haven, Connecticut 06516
(203) 932-2225, 934-4834 fax
Email: bob@mkbd.com

CERTIFICATE OF SERVICE

This is to certify that a copy of the foregoing Motion has today, February 2, 2007, been mailed to:

Michael McGarry
U.S. Attorney's Office
157 Church Street, 23rd Floor
P.O. Box 1824
New Haven, CT 06510

Jonathan J. Einhorn
412 Orange Street
New Haven, CT 06511

Richard S. Cramer
449 Silas Deane Highway
Wethersfield, CT 06109

Michael Stanton Hillis
Carl Frederick
Dombroski, Knapsack & Hillis
129 Whitney Avenue
New Haven, CT 06510

Kurt F. Zimmermann