UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL NUMBER: 3:02CR341 (EBB) |
| | : | |
| v. | : | |
| | : | |
| ANGEL HERNANDEZ, DAVID BROWN, | : | |
| RICHARD BROWN and NELSON DATIL | : | February 7, 2007 |

### GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING

Angel Hernandez, David Brown, Richard Brown, and Nelson Datil ("Datil") were found guilty by jury verdict. Hernandez was found guilty on all counts of the Fourth Superseding Indictment. Count 1 charged all defendants with conspiracy to commit mail fraud and wire fraud, in violation of 18 U.S.C. § 371. Counts 2 through 22 charged Hernandez (in all) and the other above-named defendants (in selective counts), with substantive counts of mail fraud and wire fraud, in violation of 18 U.S.C. §§ 1341 and 1343, respectively.[1]

On September 19, 2006, the Court held a hearing to determine the amount of loss suffered as a result of the defendants' conspiracy and to address issue of restitution.

On January 18, 2007 the Court issued an order (Doc. 785) requesting that the government and defendants submit briefs regarding the issues of loss and restitution on or before February 2, 2007 with reply briefs to be filed on or before February 16, 2007. On February 2, 2007, the government filed a motion for a 5-day extension of time (Doc 794) until February 7, 2007. On February 5, 2007 the Court granted the government's motion for an extension of time.

---

[1]    The jury convicted Hernandez, David Brown, and Datil of all counts in which they were charged. The jury convicted Richard Brown of Counts 1, 17, and 18. The jury acquitted Richard Brown of Counts 8, 11, and 12.

## I.    Factual Background

At the hearing held September 19, 2006, to determine the amount of loss suffered as a result of the defendants' conspiracy.  The Government put on two witnesses, one from Mitsubishi Motors Credit of America ("MMCA") and Special Agent Stuart Collier from the United States Secret Service.  Through the witnesses, the Government provided evidence to the Court, to supplement the evidence previously introduced at trial, and established by way of a number of methodologies and by a preponderance of the evidence the amount of loss suffered by MMCA – $6.5 million.  Additionally, the government established that a portion of the $6.5 million loss ($2.7 million) arose from car deals that resulted in suits by customers who had sued Shoreline and MMCA based on the fraudulent conduct.   Finally, the government established through the testimony of United States Secret Service Agent Stuart Collier that the total gain to the defendants, including Shoreline itself, during the course of the conspiracy was $2.4 million.

## A.    MMCA Suffered $6.5 million in Loss Attributable to the Fraud.

First, the Government established that the loss incurred by MMCA – to that point in time September 2006 – that was attributable to the fraud is $ 6.5 million dollars and that the projected loss attributable to the fraud is $8 million.  (Government's Exhibit ("GX") AB).

Ms. Diane Cutillo, the Director of Operations at MMCA provided the court with a spread sheet, GX AB that provided an analysis of the portfolio that MMCA held or purchased from Shoreline.  The analysis was based on the statistical analysis performed by the MMCA credit risk department.  As set forth in GX AB, the actual performance of the Shoreline portfolio had a loss that was $6.5 million greater than what was expected based on the credit quality in the portfolio.  Said another way, using the statistical analysis, and controlling for the numerous factors that are

both anticipated and that affect the entire MMCA portfolio, $6.5 million in loss was caused by
the fraud.  MMCA has determined based on the statistical analysis performed on the Shoreline
portfolio that over the life of the loans, the loss caused by the loss will be $8 million.  As Ms.
Cutillo testified:

> A.  If you look at the very bottom and look at the expected lifetime loss of $6,789,000
> and then look at the figures next to that, the actual loss, which was, again, the
> amount that was charged off. . . . Thirteen, which the various - - there is
> approximately $6.5 million, which is obviously over the expected loss by almost
> double.  And again, when you look at the projected, the amount included for the
> future, that brings the projected total loss to $8 million.

> Q.  So, based on modeling that Mitsubishi has come up with, they expected the
> Shoreline portfolio will have a projected loss of $8 million?

> A.  That's correct.

> Q.  Over $8 million?

> A.  Mitsubishi has begun or it's our feeling that this discrepancy is part of the
> fraudulent contracts - - related to fraudulent contracts.

Hearing Transcript Sept. 19, 2006 ("Tr.") at 45-47.

> Q.  Now, how can or maybe you can explain how the number of $8 million is reached
> to a projected loss amount as compared with the 6.5 that Mitsubishi has concluded
> it suffered to date?

> A.  The 6.5 was actual as of the time the vehicle was - - or account was charged off.

> Q.  Okay.

> A.  And the incremental amount for the future is based on a percentage of the
> remaining terms in the contract.

> Q.  And is that based on the anticipation that future loans will continue to under
> perform or fail to perform?

> A.  It's based on the model for an expected loss at any time. You can look at the
> portfolio, and as the terms of the contract cycle and there's fewer months of the

term, the amount of loss is reduced.

Tr. at 48-49.

Ms. Cutillo testified that the portfolio was $52 million, meaning MMCA financed $52 million worth of car purchases. Of that financing, there were a certain amount of losses that were anticipated, in that a certain number of loans either don't perform or under perform. This figure was expected or anticipated to be $6.7 million. However, the fraud *caused* 6.5 million in losses that were not anticipated.

> A.    That's the projected dollar amount loss on the amount financed, of the $52 million, was projected to be 28.4 percent by term of the contract.
>
> Q.    And that was approximately $14 million?
>
> A.    Correct.
>
> Q.    And that's controlled - - and the 6.7 is what may have been anticipated or was anticipated, and so the difference is the loss that was caused by the fraud, correct?
>
> A.    That's correct.

*Id*.

As the defendant's own witness testified  ". . . if the dealership financing team suddenly condones fraud, there will be some transactions that are precipitated as a result of the fraud that otherwise would not have occurred." Tr. 239   As the trial evidence established beyond a reasonable doubt, when Angel Hernandez joined Shoreline, the financing team did condone fraud.

This evidence, based on the statistical analysis of MMCA and as testified to by Ms. Cutillo provides the Court more that a reasonable estimate of the loss suffered by MCCA

**B.     MMCA Suffered a Loss of Principal of $2.7 Million on the "Setteled Cases" Alone**

At the hearing, the Government also introduced evidence of a portion or sub set of MMCA's loss suffered as a result of the fraud.  In preparation for the hearing, MMCA prepared a chart of setting forth the lost principal suffered on 247 particular vechile loans that were the subject of litigation.  (GX AA.)  As the Court is well aware and as was testified to at trial, a number of victims sued Shoreline and MMCA based on the fraudulent representations that were made to them regarding the balloon payments, the CD players, the insurance, and other add ons.  As demonstrated at trial, a number of these victims who were mislead by the salesmen and business office personnel also had drastic misrepresentations on their credit applications.  It was part and parcel of the scheme to lied to MMCA to get the credit approved, and lied to the customers so the total dollar value of the sale was increased.

Turning to the particular 247 deals for which suits were brought, MMCA lost $2.7 million in principal exclusive of interest on these deals.  *See* GX AA.  The affidavits in which the customers for the 247 transactions swore and or affirmed under penalty of perjury that they were lied to at Shoreline were provided to counsel and the Court as evidence that the loans were a result of the fraud of which the defendants were convicted.  The fact that MMCA lost $2.7 million on these car loan *alone* is a direct financial loss tied to the fraud.  As set for in a number of the affidavits and as victims testified to at trial, if they had been told about the balloon payments, they would not have entered in to the contract.  However, they were not told about the balloon payments or the add ons, they did enter in to the contract, MMCA advanced the funds, the co-conspirators received their profit and MMMCA lost a significant amount of money on the principal for each of the 247 fraudulent loans.

As Ms. Cutillo testified,

Q.    And the total amount loss on just these 247 deals is how much?

A.    $2,744,852.57.

Q.    And going back to your other chart. The total amount of total units or the total number of cars that made up the portfolio was how much?

A.    2,124

Q.    So this 247 is only a portion of the entire portfolio, correct?

A.    That's correct.

Q.    And was this derived from the settlements? From the people who settled?

A.    AA is derived from the settlements.

Q.    So, as far as the other losses that may have been suffered to date, they're not included on here?

A.    That's correct.

Tr. at 84.

## C.    The Trial Evidence Alone Established a Loss of $365,972 on a Mere 29 deals.

The evidence introduced at trial and the trial testimony of Greg Stiff of MMCA (GX 01-50) established that on the 29 deals for which live testimony was presented. MMCA suffered a loss of $365,972.  This figure was reached, exclusive of interest, by deducting any payments made and the proceeds from the repossessions up to that point from the total amount advanced on those deals.

The court could extrapolate the loss suffered on these 29 deals and if only 580 of the more that 2000 deals were fraudulent deals (less than 30%) and the loss suffered was in the same proportion, that would result in an estimated loss of $7.2 million.  This would be based on a

conservative estimate of fewer than 30% of the deals involving fraud in light of the fact that Jose Concepcion estimated at least 50% of all deals had increased incomes;[2] Bruce Vetre testified that Angel Hernandez told him to enhance the income on almost every deal,[3] and James Clanton testified that the income in every deal was changed.[4]

**D.    The Co-Conspirators Made $2.4 Million During the Scam**

The government established through the testimony of United States Secret Service Agent Stuart Collier, relying only on reported income, that the total gain to the defendants, including Shoreline itself, during the course of the conspiracy was $2.4 million.  Tr. at 239.  This figure was based on the Connecticut department of labor records and the business records of Shoreline. This figure under represents the fraud as it does not capture any cash down payments taken or any unreported income.

## DISCUSSION

As the Court is well aware, "[t]he court need only make a reasonable estimate of the loss." Guidelines Manual § 2B1.1 cmt. 2(c) (2003).   The Second Circuit recently reiterated this well established principle in *United States v. Granik*, 386 F.3d 404 (2d Cir. 2004), where the Court held that the Sentencing "Guidelines do not require that the sentencing court calculate the amount of loss with certainty or precision."  *Id.* at 414 n.7 (*quoting United States v. Bryant*, 128 F.3d 74, 75 (2d Cir. 1997) (per curiam ).   "Rather, a loss amount estimate need only be

---

[2]      Jose Concepcion stated that he believed the fraud rate was 50 %, i.e., 50% of the deals had false information on them submitted to MMCA.  (Concepcion interview 10/15/04.)

[3]      Testimony of Bruce Vetre, Aug. 11, 2005, at 33, ln 6-15.

[4]      Testimony of James Clanton, Aug. 23, 2005, at 99, ln 3-19

"'reasonable given the available information.'" *Id*. *See* 2B1.1 Application Note 3. The court

need only make a reasonable estimate of the loss, given the available information." Guidelines §

2B1.1 Application Note 2(c).

As the Second Circuit explained in *United States v. Bryant* 128 F.3d 74 (2d Cir. 1997),

"'estimate, for example, may be based upon the approximate number of victims and an estimate

of the average loss to each victim.' In keeping with this philosophy, it is permissible for the

sentencing court, in calculating a defendant's offense level, to estimate the loss resulting from his

offenses by extrapolating the average amount of loss from known data and applying that average

to transactions where the exact amount of loss is unknown." *Bryant* 128 F.3d at 76 (quoting

Guidelines Appl. Note).

Sentencing Courts have applied and the Second Circuit has endorsed a numerous

different methodologies for arriving at a reasonable estimate of loss. In *United States v. Sutton*,

13 F.3d 595, 596-97 (2d Cir. 1994) (per curiam), for instance, where the defendant had received

payments of $80-$1,500, usually in the $750-$1,200 range, for fraudulently issued driver's

licenses, the Second Circuit found that it was not unreasonable for the sentencing court to

compute the loss attributable to the defendant's scheme by estimating a payment of $250 per

license and multiplying that sum by the total number of applications. *See id.* at 599-600.

In *Bryant* 128 F.3d at 74, the sentencing court estimated the tax loss caused by Bryant on

nearly 7,000 tax returns most of which had not been audited and suggested that it would be

reasonable to base the loss on the average loss caused by the returns that had been audited which

was determined to be $2,400-per-return. However, the sentencing court used an estimated

average of less than $100 per unaudited return, instead of the average loss determined by the

audits.  The Second Circuit found this to be highly generous to the defendant.    As the *Granik*
Court observed, the Second Circuit has for instance "approved the use of coconspirator estimates
for determining loss amount."  *Granik*, 386 F.3d at 414 (*citing United States v. Germosen*, 139
F.3d 120, 129 (2d Cir. 1998).   In *Granik*, the Second Circuit held that the stipulation as to loss
amount in the plea context was also a proper basis for the district court's findings as to the loss
amount.  *Granik*, 386 F.3d at 414.  In short, "the sentencing court remains entitled to rely on any
type of information known to it when determining an appropriate sentence." *See United States v.*
*Fagge*, 101 F.3d 232, 235 (2d Cir.1996).

**A.    Mitsubishi's Loss Was Calculated at $6.5 million**

        The evidence established at the hearing that the loss incurred by MMCA – to that point in
time September 2006 – that was attributable to the fraud is $ 6.5 million dollars.  The testimony
established that MMCA used a reasonable method in comparing the losses suffered by the
Shoreline portfolio to those that would have been expected but for the fraud.  The testimony
clearly provides the court a reasonable factual basis to conclude the loss amount is $6.5 million.
Clearly this process is consistent with the methods endorsed by the Second Circuit.  For instance
in *Bryant*  128 F.3d at 76, the Court endorsed the sentencing court's extrapolating the average
amount of loss from known data and applying that average to transactions where the exact
amount of loss was unknown.  Here the MMCA credit risk desk under took the extrapolation and
Ms. Cutillo provided testimony.

        This evidence is the most accurate estimate of the amount of harm caused by th efraud.
MMCA makes it their business to determine factors that affect the ability to collect on
outstanding loans.  The fact hat the head of operations of MMCA testified that they had

determined that $6.5 million dollars worth of loss was attributable to the fraud should be given significant weight. This is the most accurate determination for loss. The government asserts that this figure should be used by the court.

Set forth below are alternative methods for calculating loss. An extrapolation by the Court of a 30% fraud rate and the loss figures determined at trial would also be appropriate, this extrapolation would result in a loss of $7.2 million which is between the $6.5 currently booked as loss by MMCA and the $8 million they anticipate eventually suffering. Accordingly, the $6.5 is slightly lower and benefits the defendants.

**B.    Mitsubishi's Lost Principal On 247 Settled Loan was 2.7 million**

As set forth above, Mitsubishi's loss on a the 247 settled case was $2.7 million. *See* GX AA (lost principal on 247 loans -exclusive of interest). This figure, while significantly under counting the loss provides an alternative appropriate figure for the Court's consideration. This figure under counts the loss because a number of deals on which MMCA lost money did not result in settled law suits. This sub group was selected because the customers had already sworn in affidavits that they were the victims of fraud and the government did not need to interview all 2,047 customers who purchased cars in order to determine if they had been defrauded. The number of vechile purchased that ended in settled lawsuits, 247, under represents the harm to MMCA because for many of the car sales that involved fraud, the customers did not file a law suit for instance of the 29 deals addressed at trial, more than half 16 did file a suit, and these individuals knew they had been the victims of fraud as they testified at a federal trial about it and

-10-

were generally asked on cross examination if they filed a law suit or were a party to any law suit.[5]

Nonetheless, this does provide the Court an alternative method for calculating loss.  In *United States v. Moskowitz*, 215 F.3d 265 (2d Cir 2000), the Second Circuit affirmed a determination of loss based settlement of consolidated class action claims.  The sentencing court also had an analysis from the class action plaintiffs' expert determining loss to the plaintiffs to be $30 million.  The Second Circuit held that "in light of the ample evidence that would have permitted a reasonable fact finder to determine actual losses to be *higher* than the range of $5 million to $10 million that the district court found applicable to Moskowitz, the court was well within its discretion in reaching its loss calculation."  *Id.* at 272.

Here as in *Moskowitz*, the Court has been provided with a significantly higher figure ($6.5 million) from the credit risk data about which Ms. Cutillo testified.  However, in the alternative, the Court could rely on the loss figure determined as a result of settled cases.   This figure under estimates the loss and is not as reliable as the $6.5 million figure discussed above.

## C.    Loss of Deals Proven at Trial Extrapolated

Alternatively, the court could extrapolate the loss suffered on these 29 deals to the portfolio as a whole.  *See Bryant*  128 F.3d 74 (2d Cir. 1997) (estimate, may be based upon the approximate number of victims and an estimate of the average loss to each victim); *Sutton*, 13

---

[5]      An example of the under inclusive nature of the 247 figure is demonstrated by simply looking at the trial witnesses.  The following victim-customers who testified at trial and who were victims of the fraud, and on whose deals MMCA lost money, are not included in the 247 or the $2.7 million figure:  Berriors, Victor; Best, Mary; Binns, Juanita; DiMauro, Paul; Fowler, Danielle; Matthews, Kelly; Montalvo, Bienvendio; Morgan, Gwendolyn; Richard, Albert; Richard, Angela; Santana, Rosa; Santiago, Jose; Sullivan, Royce; Torres, Jessica; Vaught, Gary; Witcher, Shirley.  For these 16 deals, the total proceeds financed less amounts received is $169,485.91.

F.3d at 596-97 (where the defendant had received payments for fraudulently issued driver's licenses, it was not unreasonable for the sentencing court to compute the loss attributable to the defendant's scheme by estimating an amount per license)

Here, if the court were to extrapolate the loss established at trial related to the 29 deals, and extrapolate that average loss across the more that 2000 deals, and assume the percent of fraudulent deals to be a mere 30% the loss would result in an estimated loss of approximately $7.2 million.   The Second Circuit has clearly endorsed such extrapolation and has also endorsed the "use of coconspirator estimates for determining loss amount." *Granik*, 386 F.3d at 414.  Here the cooperating co-conspirators place the fraud rate significantly higher than 30%.  *See United States v. Davis,* 41 Fed. Appx. 493, 496, 2002 WL 1369795 (2d Cir 2002) "this Circuit  has affirmed loss determinations extrapolated from an average loss amount based on known data in cases where the instances of theft, embezzlement or fraud are numerous."

**D.     Gain During Couse of Conspiracy**

As the Court is well aware, the Guideline contemplate the use of gain in cases where loss is difficult or impossible to determine.  U.S.S.G. Appl. Note 3(b).  Here, if the Court were to use gain to the defendants, it would significantly undervalue the financial harm caused.  The very nature of the asset serving as collateral, the cars which depreciate during the life of the loan, the financial harm to the lender far outweighs the gain.  Nonetheless, if the Court were to use gain to the co-conspirators, it would be appropriate to use the entirety of their gain.

The trial testimony revealed that there was fraud committed every day, and according to some cooperators on every deal.  It was clear from the trial testimony that incomes were enhanced and liabilities reduced to get the deals done.  The Government asserts that loss has been

-12-

ascertained and testified to by MMCA as discussed above.  However, if gain were to be used as a proxy, the entire gain to all th eco-conspirators and the shoreline entity would be proper and that would be $2.4 million.  Tr. at 239.

## LOSS ATTRIBUTABLE TO EACH DEFENDANT

"Pursuant to section 1B1.3, if a defendant participates in 'jointly undertaken criminal activity,' he or she may be sentenced based on criminal acts committed by other participants if the acts were committed in furtherance of the jointly undertaken activity and could reasonably have been foreseen by the defendant."  *United States v. Studley*, 47 F.3d 569, 573 (2d Cir.1995). The phrase "jointly undertaken activity" is addressed in section 1B1.3 Application Note Two which sets forth the following two prong test:  A "jointly undertaken criminal activity" is a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy.  In the case of jointly undertaken criminal activity, subsection (a)(1)(B) provides that a defendant is accountable for the conduct (acts and omission) of others that was both: (i) in furtherance of the jointly undertaken activity;  and (ii) reasonably foreseeable in connection with that activity."  U.S.S.G. 1B.1. Appl. Note 2. *Accord  United States v. Maaraki*, 328 F.3d 73, 75 (2d Cir. 2003).

The activity here was jointly undertaken and was reasonably foreseeable in that the defendants' were members of the same conspiracy, employed at the dealership, well aware of the criminal conduct of their colleagues, and privy to the activity going on.  *See  generally United States v. Jackson*, 335 F.3d 170, 175 (2d Cir 2003) (addressing foreseeability in the drug context and addressing factors that can be considered to include *inter alia*: when a defendant joined the conspiracy, what he did, whether he knew the other members, whether he knew of the conduct of

other coconspirators).  *See United States v. Podlog*, 35 F.3d 699, 707 (2d Cir 1994) (finding that the government need only establish the amount of narcotic foreseeable to the defendant by a preponderance of the evidence).

As the Court held in its rulings on the post trial motions, "[t]he government witnesses testified that this unlawful agreement was planned and discussed during "Saturday Sales Meetings," mandatorily attended by managers and salespersons.  Angel Hernandez organized and lead these meetings, often instructing salespersons and managers to communicate during the credit application process to ensure that only one employee, either a manager or salesperson, falsely adjusted the customer information. Since there was evidence that every salesperson and manager was required to attend these meetings, the jury could infer that the defendants were aware of the fraudulent agreement."  March 6th Opinion at 17.

The charts below evidence the percent of the total loss incurred during the tenure of each individual defendant as a percentage of the total loss incurred during the life of the conspiracy. This calculation was done by taking the number of new vehicles sold while the defendant was employed at Shoreline Mitsubishi and part of the conspiracy, and dividing that figure by the total number of new vehicles sold during the conspiracy (2,061).[6]  The cars sold after a defendant left the employ of the dealership were not included, this enures to the benefit of each such situated

---

[6]    The total number of new vehicles sold during the course of each defendant's employment is based upon the total number of sales made within each month of employment. The sales figures were maintained on a monthly basis and not broken down by sales per day. Accordingly, since none of the defendants began their employment on the first of the month, and since neither Nelson Datil nor Richard Brown ended their employment on the final day of the month, partial months have been dropped for the benefit of the defendants.  Thus the figures skew, slightly, *in favor* of the defendants in that, sales figures for partial months were dropped from the calculations.

defendant.

| Defendant | Dates of Employment | Dates for Purposes of Loss Calculation | Total New Vehicles Sold During Membership in Conspiracy | Percent of Loss Incurred During Membership in Conspiracy |
|---|---|---|---|---|
| Angel Hernandez | 02/10/00-09/30/02 | 02/00-07/02 | 2061[7] | 100% |
| David Brown | 11/11/00-09/30/02 | 12/00-07/02 | 1696 | 82% |
| Richard Brown | 09/19/01-05/08/02 | 10/01-04/02 | 831 | 40% |
| Nelson Datil | 09/10/01-08/15/02 | 10/01-07/02 | 1092 | 53% |

Applying these percentages to the lower of the figures, that is, the $6.5 million loss

reported by MMCA, as compared to the $7.2 extrapolation figure, results in the following loss

figures for each defendant.

| Defendant | Dates for Purposes of Loss Calculation[8] | Percent of Loss Incurred During Membership in Conspiracy | Amount of Loss During Membership in Conspiracy |
|---|---|---|---|
| Angel Hernandez | 02/00-07/02 | 100% | $ 6.5 million |
| David Brown | 12/00-07/02 | 82% | $ 5.33 million |
| Richard Brown | 10/01-04/02 | 40% | $ 2.6 million |
| Nelson Datil | 10/01-07/02 | 53% | $ 3.45 million |

---

[7]    *See* Gov. Ex. 102A for a Monthly Breakdown of New Vehicles Sold from January 1999 through October 2002

[8]    July of 2002 is used as the last month of the conspiracy.  (See Fourth Superseding Indictment (Dkt # 455)).

As the Second Circuit stated in the unpublished opinion in *United States v. Davis,* 41 Fed. Appx. 493, 496, 2002 WL 1369795 (2d Cir 2002) "this Circuit has affirmed loss determinations extrapolated from an average loss amount based on known data in cases where the instances of theft, embezzlement or fraud are numerous. *See,* e.g., *United States v. Bryant*, 128 F.3d 74, 76 (2d Cir.1997) (per curiam). In *Davis*, "the district court calculated an annual average loss ($760,000) based on two years' worth of losses and then multiplied that average by the number of years that each defendant participated in the conspiracy." *Davis,* 41 Fed. Appx. at 496. The Second Circuit in *Davis* held that the "loss calculation would be reasonable despite any minor deficiencies in the factual background regarding the level of activity during the 1980s [time of the conspiracy]." *Id* (citing *Sutton*, 13 F.3d at 599-600 (per curiam).

Additionally, the plea agreements provide the Court useful information as to the loss amounts of similarly situated co-conspirators. In entering in to the plea agreements with the other defendants, the Government took a consistent approach to loss amount and the defendants entered plea agreements setting forth the amount of loss that was foreseeable based on their place in the conspiracy. On the guideline issues of loss, the amount of loss agreed upon as foreseeable to the particular defendant. Each of the defendants who entered guilty pleas (but for Rivera[9]) stipulated that a loss of more than $400,000 was attributable to them. The Court can and should consider this in determining what amount of loss was foreseeable and thus attributable to each of the defendants who proceeded to trial. *See Granik*, 386 F.3d at 414 (stipulation as to loss amount in the plea context a proper basis for the district court's findings as to the loss amount).

---

[9]     Rivera worked a significant portion of his time in the marketing area and only worked in the sales capacity, for a lesser portion of his tenure. Accordingly, the government took a conservative approach as to the percentage of the fraud to attribute to Rivera.

| Defendant | Loss Amount § 2B1.1(b)(1) |
|---|---|
| James Clanton | $400,000 - $1 Million |
| Jose Concepcion | $400,000 - $1 Million |
| Richard Dominguez | $400,000 - $1 Million |
| Michael Rivera | $70,000 - $120,000 |
| Bruce Vetre | $400,000- $1 million |
| Jose Espinosa | $400,000- $1 million |
| Lou Pierro | $500,000 - $800,000 (Nov. 1, 2000 Version of Guidelines applicable) |

Here, based on the percentage of illegal conduct that occurred while each defendant was a member of the conspiracy, (i.e., based on sales that occurred while they were employed as a portion of total sales during the conspiracy), the above referenced amounts should be attributable to the respective defendants as part of the jointly undertaken activity that was clearly reasonably foreseeable.

**VICTIM CONDUCT IS NOT A CONSIDERATION FOR LOSS**

At the September 19, 2006 hearing, the defendants introduced testimony seeking to attribute the blame or a portion of the loss to MMCA's conduct, specifically its lending policies. First, the conduct of the victim does not enter in to the Court's calculations with respect to loss amounts. Second, in only rare instances, can the Court consider a victim's conduct as a grounds for departure where the victim did something wrong. *See* U.S.S.G. § 5K2.10*; See United States v. LeRose*, 219 F.3d 335, 340 (2d Cir. 2000) (vacating departure based on supposed bank misconduct in bank fraud case, and stating that "we have emphasized that not only must the victim's conduct be provocative, but 'the victim must actually have done something wrong'"

-17-

(*quoting United States v. Morin*, 80 F.3d 124, 128 (4th Cir. 1996)). *See United States v. Godding*, 405 F.3d 125, 126-27 (2d Cir. 2005) (per curiam) (finding it "troubl[ing]" that district court relied in part on bank's failure to detect embezzlement when granting downward departure to defendant employee). No such grounds are present here.

U.S.S.G. § 5K2.10, "Victim's Conduct," provides that "[i]f the victim's wrongful conduct contributed significantly to provoking the offense behavior, the court may reduce the sentence below the guidelines range to reflect the nature and circumstances of the offense." The factors enumerated in § 5K2.10 are geared toward crimes involving violence. In fact, § 5K2.10 states that "this provision usually would not be relevant in the context of non-violent offenses." However, "[t]here may . . . be unusual circumstances in which substantial victim misconduct would warrant a reduced penalty in the case of a non-violent offense." Id. By way of example, § 5K2.10 cites "an extended course of provocation and harassment might lead a defendant to steal or destroy property in retaliation." Id.

Victim conduct is not an appropriate basis for departure in this case. *See United States v. Godding*, 405 F.3d 125, 126-127 (2d Cir. 2005) (per curiam). Victim conduct should generally only be considered in relation to violent crimes in which the victim's behavior provoked the defendant's offense behavior. U.S.S.G. § 5K2.10.

In *Godding*, 405 F.3d at 127, the Second Circuit found that a bank's failure to detect and prevent embezzlement by the defendant, its employee, could not be considered as a basis for downward departure. According to the Court, the bank's failure to detect and prevent the embezzlement did nothing to lessen the defendant's responsibility. *Id*. In the present case, the lending institution MMCA eventually did tighten its practices and place Shoreline on probation.

-18-

Nevertheless, *the Godding reasoning is squarely on point. See also United States v. LeRose*, 219 F.3d 335, 340 (4th Cir. 2000) (vacating departure based on supposed bank misconduct in bank fraud case, and stating that "we have emphasized that not only must the victim's conduct be provocative, but 'the victim must actually have done something wrong'") *(quoting United States v. Morin*, 80 F.3d 124, 128 (4th Cir. 1996)).

In the case of non-violent offenses, § 5K2.10 provides that "an extended course of provocation and harassment might" warrant a departure for victim misconduct. "Provocation necessarily involves deliberate conduct that stirs a defendant to action." *LeRose*, 219 F.3d at 340.

Here, even assuming *arguendo* that the Court were to afford the testimony of the defendant's expert any weight, the lending policies of MMCA which he described as "loose," would not change the loss calculation. Moreover, as to serving as a ground for departure, there is no evidence that MMCA did anything "wrong" with respect to their lending practices. By analogy, even if the Court were to conclude that MMCA was less than vigilant and in essence left their windows unlocked, the amount of money that was stolen is not diminished, nor does it lessen the criminal conduct of the defendants who knowingly opened the unlocked windows to steal $6.5 million. Furthermore, it has not been established that the victim did something "wrong" as contemplated by the Second Circuit. *See LeRose*, 219 F.3d at 340.

As the defendants' own witnesses testified: "there was something radically wrong with the way the vehicles were marketed." Tr. at 227. "To some degree, you're right, to the extent that if the dealership financing team suddenly condones fraud, there will be some transactions that are precipitated as a result of the fraud that otherwise would not have occurred." Tr. 239. "[l]oan application fraud, repossessions were deals that would not have been approved, had the

-19-

actual truth been told in the applications.  Then in those cases, those loans would not have or

those losses can be attributable to the loan application fraud."    As established at trial, Bruce

Vetre testified that Angel Hernandez told him to enhance the income on almost every deal,[10] and

James Clanton testified that the income in every deal was changed.[11]  Furthermore, Jose

Concepcion stated in a pre-trial interview that in his estimate at least 50% of all deals had

increased incomes.  Any argument that MMCA caused its own loss is without merit.  Moreover,

it makes no sense that MMCA would purposefully seek to lose money by underwriting non-

performing loans.  This argument is belied by the fact that MMCA put Shoreline on probation

and instituted stricter credit requirements.  Finally, Victim Conduct is not an appropriate ground

for the court to consider in making a loss determination and is not an applicable grounds for

departure in this case.

### Restitution Should be Ordered

Title 18 Section 3663 authorizes restitution for "the amount of the loss sustained by each

victim as a result of the offense." 18 U.S.C. § 3663(a)(1)(B)(i)(I) (emphasis supplied).  Title 18

Section 3664(f)(1)(A), provides that "in each order of restitution, the court shall order restitution

to each victim in the full amount of each victim's losses." *Id.* § 3664(f)(1)(A).    The Supreme

Court has held that restitution is authorized only for "the loss *caused by* the specific conduct that

is the basis of the offense of conviction." *Hughey v. United States*, 495 U.S. 411, 413 (1990)

(emphasis supplied).  The Second Circuit has held that restitution may only be ordered "for

losses that were . . .  directly caused by the conduct composing the offense of conviction," *United*

---

[10]       Testimony of Bruce Vetre, Aug. 11, 2005, at 33, ln 6-15.

[11]       Testimony of James Clanton, Aug. 23, 2005, at 99, ln 3-19

-20-

*States v. Silkowski,* 32 F.3d 682, 689 (2d Cir.1994); *United States v. Germosen,* 139 F.3d 120, 130 (2d Cir.1998); *see also United States v. Carboni*, 204 F.3d 39, 47 (2d Cir.2000).

Actual loss is defined under the Sentencing Guidelines as "the reasonably foreseeable pecuniary harm that resulted from the offense." § 2B1.1 , cmt. n. 2(A)(ii) (2001). Reasonably foreseeable pecuniary harm is the harm "that the defendant[s] knew or, under the circumstances, reasonably should have known, was a potential result of the offense." *Id.* at cmt. n. 2(a)(iv). *See, e.g., Carboni*, 204 F.3d at 42, 46-47 (Second Circuit did not disturb the part of award of restitution representing actual loss to bank based on defendant's default on loan when increases in credit had been fraudulently obtained).

In this case where MMCA has suffered a loss as a result of the defaults on the numerous loans that were originated based on the defendants fraudulent conduct. This loss determined to be $6.5 million should be included in the restitution order.

Additionally, MMCA has reached settlement agreements with 247 of Shoreline victim-customers and as such made them whole for any actual losses suffered. Accordingly, as a person who provided . . . compensation to a victim may be awarded compensation, pursuant to 18 U.S.C. § 3664(j)(1), the restitution to these 247 would go directly to MMCA. *See also United States v. Malpeso*, 126 F.3d 92, 95 (2d Cir. 1997). Title 18 U.S.C. § 3663 provides that "the court may, in the interest of justice, order restitution to any person who has compensated the victim for such loss to the extent that such person paid the compensation." 18 U.S.C. § 3663(e)(1)(1994). "The order of restitution shall require the defendant to make restitution directly to the victim or other person eligible under this section." 18 U.S.C. § 3663(f)(4)(1994). As the Second Circuit stated in *United States v. Malpeso* 123 F.3d 92, 95 (2d Cir 1997) "Courts

have broadly construed this provision to permit awards of restitution to institutions and government agencies that have compensated victims of a defendant's criminal conduct. *Malpeso* 123 F.3d at 95 (collecting cases and citing, *United States v. Atkinson*, 788 F.2d 900, 905 (2d Cir. 1986) (insurance company, which had reimbursed victim bank for losses due to armed robbery, compensable under VWPA); *United States v. Cloud*, 872 F.2d 846, 853 (9th Cir. 1989) (insurance company, which had reimbursed victim bank for losses due to bank fraud, compensable under VWPA); *United States v. Sunrhodes*, 831 F.2d 1537, 1545-46 (10th Cir. 1987) (Indian Health Service, which had reimbursed medical practitioners for costs of treating victims of shooting, compensable under VWPA)).

In *Malpeso*, the Second Circuit affirmed an order of restitution to the FBI where the Bureau had paid expenses of an individual up front, and found there to be no difference where FBI had been an indemnitor. *See Malpeso* 123 F.3d at 95.

Observing that an order of restitution may be more of an academic exercise as the defendants may never make $6.5 million, the case law supports the proposition that a restitution order to be paid to MMCA would be proper as MMCA has acted as an indemnitor.

## <u>CONCLUSION</u>

For the forgoing reasons, the government respectfully asserts that the loss figure testified to by Ms. Cutillo, the MMCA representative, provides the Court an appropriate and reasonable estimate (if not precise analysis) of the loss caused by the defendants, given the available information. Accordingly, the Court should find $6.5 million to be the amount of loss and find the foreseeable loss amounts based on the percent of the conspiratorial conduct engaged in while each defendant respectively, was a member of the conspiracy.

Respectfully submitted,

KEVIN J. O'CONNOR
UNITED STATES ATTORNEY

/s/
MICHAEL S. McGARRY
ASSISTANT UNITED STATES ATTORNEY
Federal Bar No. ct25713
157 CHURCH STREET
NEW HAVEN, CONNECTICUT 06510
(203) 821-3700
Email: michael.mcgarry@usdoj.gov

## <u>CERTIFICATE OF SERVICE</u>

       This is to certify that on February 7, 2007, a copy of the foregoing was served by U.S.

Mail on the following persons:

Robert C. Mirto, Esq.                          Kurt F. Zimmermann, Esq.
Mirto, Ketaineck, Barrett & DiCrosta           Silverstein and Osach, P.C.
P.O. Box 428                                   234 Church Street, Suite 903
West Haven, CT 06516                           New Haven, CT 06510
(counsel for David Brown)                      (counsel for Angel Hernandez)


Michael S. Hillis, Esq.                        Jonathan J. Einhorn, Esq.
Dombroski Knapsack & Hillis LLC                412 Orange Street
129 Whitney Avenue                             New Haven, CT 06511
New Haven, CT 06511                            (counsel for Nelson Datil)
(counsel for Richard Brown)


     /s/
MICHAEL S. McGARRY
ASSISTANT UNITED STATES ATTORNEY